MINNESOTA MINING AND MAN-
UFACTURING Company, Inc.,
Plaintiff,

v.

BEAUTONE SPECIALTIES CO., LTD.,
Beautone Specialties Co. Ltd., Yon–
Fon–Yui Co., Yuen Foong Paper Co.
Ltd., Yuen Foong Yu Paper Mfg Co.,
Ltd., and Taiwan Hopax Chemicals
Mfg. Co. Ltd. Inc., Defendants.

No. 94–CV–11156–MEL.

United States District Court,
D. Massachusetts.

July 14, 1999.

Francis C. Lynch, Palmer & Dodge, Boston, MA, James Edward Anklam, Jones, Day, Reavis & Pogue, Washington, DC, Richard A. Dollinger, Mousaw, Viggdor, Reeves, Heilbronner & Kroll, Rochester, NY, for Defendants.

## MEMORANDUM AND DECISION

LASKER, District Judge.

Minnesota Mining & Manufacturing Company, Inc. ("3M") sues Taiwan Hopax Chemicals Mfg. Co., Ltd., Yuen Foong Paper Co., Ltd., Yuen Foong Yu Paper Mfg. Co., Ltd., Beautone Specialties Co. Ltd. [Taiwan], and Beautone Specialties Co. Ltd. [Boston], (collectively "Beautone") alleging that the defendants have infringed 3M's U.S. Patent No. 4,166,152 (the "Baker–Ketola patent" or the " '152 patent"), entitled "Tacky Polymeric Microspheres." The defendants move for summary judgment under Fed.R.Civ.P. 56. The motion is granted.

### I.

The Baker–Ketola patent covers the adhesive used on the repositionable notes that 3M manufactures and sells under the trademark POST IT®.[1] The adhesive is made up of inherently tacky, polymeric microspheres invisible to the naked eye. Unlike the flat coating in conventional adhesives such as 3M's Scotch® brand tape, only the tips of the adhesive microspheres make contact with the surface on which the note is placed, thereby reducing the contact area and resulting in lower adhesive force. The adhesive, therefore, allows 3M's repositionable notes to be sticky enough to stay in place (i.e., the adhesive has high "tack"), but also permits them to be readily removed without damaging the page (i.e., it has low "peel").

The patent also discloses an improved process for preparing the adhesive micro-

Frank P. Porcelli, Ralph Anthony Mittelberger, Fish & Richardson, Washington, DC, for Plaintiff.

1. The Baker–Ketola patent expired during the pendency of this suit and is now in the public domain.

spheres. Classic suspension polymerization was considered ill-suited because it lacked the stability necessary to prevent the polymer droplets from agglomerating. However, a previous patent, the "Silver" patent (U.S. Patent No. 3,691,140),[2] had taught the use of a modified form of suspension polymerization known as aqueous suspension polymerization. This modified process departed from traditional suspension polymerization because it required the use of emulsifier above the "critical micelle concentration."[3] Agglomeration of the microspheres was prevented by adding an ionic comonomer, which stabilized the reaction by electrostatic or ionic stabilization.[4] This comonomer participated in the polymerization and became part of polymer chains making up the microspheres. Accordingly, the Silver patent specified that the ionic comonomer was an essential ingredient in successful microsphere preparation.

The innovation of the Baker–Ketola patent was that agglomeration could be avoided in the aqueous suspension polymerization process by using an ionic suspension stabilizer, which also relied on electrostatic stabilization, rather than an ionic comonomer. The use of an ionic suspension stabilizer instead of an ionic comonomer simplified the polymerization process and made it easier to control. Moreover, unlike the ionic comonomer of the Silver patent, the ionic suspension stabilizer did not participate in the actual polymerization or become part of the resulting microspheres. As the Background of the Invention section of the Baker–Ketola patent explains:

It has now been found that inherently tacky microspheres having physical properties similar to those of the Silver patent ... can be prepared which are not limited to copolymers, but may also be homopolymers, and do not contain an ionic comonomer. The microspheres are prepared by aqueous suspension polymerization, but have as an essential ingredient in their preparation a hereinafter defined suspension stabilizer.

The patent claims go on to specify that the suspension stabilizer be "ionic" and have "an interfacial tension of at least about 15.0 dynes per centimeter."

The accused products are "STICK ON" notes imported from Taiwan and sold in the United States by Beautone. The adhesives used on the accused notes, Glues F, G, or combinations and derivatives thereof,[5] like the Baker–Ketola adhesive, are made up of numerous, tacky, polymeric microspheres and are prepared using aqueous suspension polymerization. However, Beautone's recipe differs from 3M's. It employs two *non-ionic* suspension stabilizers, polyvinyl alcohol and hydroxy propyl methyl cellulose ("HPMC"), rather than an *ionic* suspension stabilizer, in stabilizing the reaction to prevent agglomeration of the microspheres. Another distinction is that the interfacial tension of polyvinyl alcohol is 9.0, the interfacial tension of HPMC is 13.0 dynes per centimeter, and their combined interfacial tension is 11.0 dynes per centimeter, which in each case is below the 15.0 dynes per centimeter specified in the Baker–Ketola patent.

2. The Silver patent was issued on September 12, 1972, to Dr. Spencer F. Silver, an employee of 3M, who assigned the patent to 3M. The patent expired on September 12, 1989, and is now in the public domain.

3. The "critical micelle concentration" is the minimum concentration necessary for the formation of "micelles," which are small particles that stabilize a reaction using steric forces.

4. Electrostatic stabilization utilizes electrical or charged forces to repel the microspheres from one another. A steric stabilizer functions like a physical coat of armor.

5. Beautone contends (and 3M does not dispute) that it no longer manufactures Glue F. Accordingly, this discussion only deals with the alleged infringing character of Glue G and Glue G–1, which is a derivation of Glue G.

3M filed this action for infringement, alleging that the adhesive microspheres used on Beautone's STICK ON notes infringed the Baker–Ketola patent. 3M also petitioned the International Trade Commission (the "ITC" or "Commission"), pursuant to section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337(a)(1)(B), for an order excluding the STICK ON notes from importation into the United States by reason of alleged infringement of the Baker–Ketola patent by the Beautone adhesive. The present action was stayed during the pendency of the ITC proceedings.

*The Baker–Ketola Patent*

The Baker–Ketola patent contains ten claims. Of those ten, only claims 1–6 are relevant to this case.[6] Claim 1, which is exemplary, is an independent product-by-process claim covering the adhesive microsspheres.[7] It begins with a description of the microspheres:

> Infusible, solvent-insoluble, solvent-dispersible, inherently tacky, elastomeric polymeric microspheres formed from non-ionic monomomers and comprising a major portion of at least one oleophilic, water emulsifiable alkyl acrylate or methacrylate ester, said polymeric microspheres having a glass transition temperature below about $-20^{\circ}$C . . .

The claim then specifies the process used to prepare the microspheres:

> having been prepared by aqueous suspension polymerization in the presence of . . .

It continues by describing the emulsifier and stabilizer required to be present during the polymerization process:

6. 3M no longer asserts claims 7–10 of the Baker–Ketola patent against Beautone as those claims were held unpatentable upon reexamination by the U.S. Patent and Trademark Office ("PTO") on the ground that they were "anticipated" by the Silver patent. That determination was affirmed by the Patent Office's Board of Appeals on April 10, 1998.

7. Claim 4, which is also an independent product-by-process claim, covers an article com-

at least one anionic emulsifier at a concentration level above said emulsifier's critical micelle concentration and an ionic suspension stabilizer having an interfacial tension of at least about 15.0 dynes per centimeter.

The patent defines "interfacial tension" as "the value determined between the monomer phase and a 1.0 percent by weight aqueous solution of the stabilizer." It also identifies a test, ASTM # D–1331–56, entitled "Standard Methods of Tests for Surface and Interfacial Tension of Solutions of Surface Active Agents" for measuring the tension. Furthermore, it warns that if the interfacial tension at this stage "falls below about 15.0 dynes per centimeter, there is insufficient stabilization of the final polymerized droplets and agglomeration may occur." In addition, the examples of suspension stabilizers disclosed in Table I of the patent all have interfacial tensions that are greater than 15.0 dynes per centimeter.

Beautone, for purposes of these motions, does not dispute that the description of the microspheres above in the Baker–Ketola patent applies to its STICK ON microspheres:

> Infusible, solvent-insoluble, solvent-dispersible, inherently tacky, elastomeric polymeric microspheres formed from non-ionic monomomers and comprising a major portion of at least one oleophilic, water emulsifiable alkyl acrylate or methacrylate ester, said polymeric microspheres having a glass transition temperature below about $-20^{\circ}$C . . .

Nor does it dispute that its adhesive microspheres are prepared using:

prising a substrate having disposed on at least one of its surfaces the adhesive microspheres covered by claim 1. Claims 2 and 3 and claims 5 and 6 are dependent claims and depend from claim 1 and 4, respectively. Therefore, all of the claims in issue contain the limitation that is at the center of this case: "in the presence of . . . an ionic suspension stabilizer having an interfacial tension of at least about 15.0 dynes per centimeter."

aqueous suspension polymerization in the presence of at least one anionic emulsifier at a concentration level above said emulsifier's critical micelle concentration.

Rather it contends that its Glue G does not infringe because it utilizes two *non-ionic* stabilizers instead of a single ionic suspension stabilizers and that the interfacial tension of its stabilizers are much less than 15.0 dynes per centimeter. Accordingly, the question of infringement in this case turns on the interpretation of the last phrase:

> in the presence of ... an ionic suspension stabilizer having an interfacial tension of at least about 15.0 dynes per centimeter.

### Prosecution History of Baker–Ketola

The above limitation was added to the claims during the prosecution of the Baker–Ketola patent, but the parties dispute the reason for the amendment. 3M alleges that the purpose of the amendment was to overcome the examiner's incompleteness objections under 35 U.S.C. § 112. Beautone argues that it was in response to the prior art rejection under 35 U.S.C. §§ 102 & 103 and, therefore, 3M is estopped under the doctrine of prosecution history estoppel from relying on the doctrine of equivalents. Because the disputed language was added following a rejection based on both the prior art and incompleteness grounds, the prosecution history is described in more detail below.

On August 17, 1977, 3M filed the application with the U.S. Patent and Trademark Office ("PTO") on behalf of William A. Baker and Warren D. Ketola. Of the original claims, only claim 7 contained the limitation requiring "an ionic suspension stabilizer having an interfacial tension of at least about 15.0 dynes per centimeter."

Initially, all of the proposed claims were rejected by a PTO patent examiner on March 16, 1978. The examiner concluded that they were unpatentable because they were anticipated under 35 U.S.C. § 102 by the Pohlemann and Morehouse patents, which both teach "aqueous polymerization of acrylic esters in the presence of an emulsifier and an ionic suspension stabilizer," and that the claimed invention was obvious at the time it was made, 35 U.S.C. § 103. In addition, the examiner concluded that the claims were broader than the support found in the specification both with respect to the makeup of the microspheres and the description of the emulsifier and stabilizer, and thereby rejected the application for failing to comply with the definiteness and completeness requirements of 35 U.S.C. § 112.[8]

3M submitted an amendment dated June 16, 1978 to the PTO. Responding to the examiner's incompleteness objections, 3M revised claims 1 and 4 by providing more detail about the microspheres and the emulsifier. In particular, the amended claims specified that the polymeric microspheres "ha[d] a glass transition temperature below about −20 Č," and that they were "prepared by aqueous suspension polymerization in the presence of at least one anionic emulsifier at a concentration level above said emulsifier's critical micelle concentration." 3M responded to the prior art rejection by distinguishing the Pohlemann and Morehouse patents on the grounds that they used *emulsion* polymerization rather than *suspension* polymerization and that they produce microspheres with different makeups.

On July 20, 1978, the examiner again rejected the application, deeming this rejection "final." He repeated his § 112 objections that both the description of the makeup of the microspheres and the pro-

---

8. Although claim 7 is no longer at issue in this case because the PTO after reexamination concluded it was unpatentable, it is worth noting that even though the claim as originally submitted called for "an ionic suspension stabilizer having an interfacial tension of at least about 15.0 dynes per centimeter," it was nevertheless initially rejected by the examiner on both incompleteness and prior art grounds.

cess conditions were incomplete because the claims did not contain the ionic suspension stabilizer limitation recited in the specification. The examiner also repeated his prior art objection, but intertwined this objection with the incompleteness objections under § 112. In particular, the examiner stated that he found 3M's arguments distinguishing the prior art unpersuasive because they "pertain[ed] to products and processes which [we]re narrower in scope than those set forth in the claims," and then referred 3M to his objections on incompleteness grounds.

On November 20, 1978, 3M requested that the examiner reconsider and submitted a further amendment entitled "Amendment After Final Rejection." In this submission, 3M amended claims 1 and 4 to specify that the polymerization take place "in the presence of . . . an ionic suspension stabilizer having an interfacial tension of at least about 15.0 dynes per centimeter," which is the limitation that is now at the heart of this dispute. 3M also altered the description of microspheres by inserting the phrase, "a major portion of," to modify "at least one oleophilic, water-emulsifiable alkyl acrylate or methacrylate ester." In so amending the claims, 3M remarked that the "present amendatory language precludes the prior art rejection." Following this amendment, on August 28, 1979, a patent, which has since expired, was awarded.

*Re-examination History*

The parties also dispute whether statements made by 3M during the 1994 reexamination of the Baker–Ketola patent's validity foreclose an interpretation of the stabilizer limitation that encompasses *in situ* formation of the "ionic" character of the stabilizer. The reexamination was granted on the grounds that: (1) the Silver patent raised a "substantial new question of patentability as to claims 1, 2, 4, 5, and 7–10"; and (2) Silver in view of the Renfrew, Ingram, Fink, or Cohen patents also raised a substantial new question of patentability as to claims 1–10.

In its reexamination statements to the PTO, 3M distinguished the Baker–Ketola claims from the Silver patent on several grounds. It stressed the fact that although the Silver microspheres and the Baker–Ketola microspheres had the same physical properties they differed structurally. The Silver micropheres were copolymers in which one of the comonomers was an ionic comonomer while the Baker–Ketola microspheres were homopolymers. 3M also distinguished the process used to prepare the Baker–Ketola microspheres from that employed in forming the Silver microspheres on the basis that the "externally added polymeric suspension stabilizer" of the Baker–Ketola process was a distinct element of the Baker–Ketola patent. As support for this distinction, 3M referred to the ten representative reactions where the stabilizer is externally added, noting that:

> The remainder of the Baker–Ketola specification supports this interpretation as well, for all of the examples use externally added, polymeric suspension stabilizers. Thus, contrary to Requestor's argument, the language 'suspension stabilizer' cannot be read broadly to include ionic comonomers.

3M also offered several grounds to distinguish Baker–Ketola from Silver in view of the Renfrew, Ingram, Fink, and Cohen patents. For example, while recognizing that the Renfrew patent covered *in situ* formation of the suspension stabilizer, 3M argued that it would not be obvious to substitute Renfrew's *in situ* suspension stabilizer for Silver's comonomer because Renfrew's stabilizer homopolymerizes while Silver's comonomer copolymerizes with the other comonomers to form the adhesive microspheres.

Upon re-examination, the PTO concluded that product claims 1–6 were patentable, but rejected process claims 7–10 as "anticipated" by the Silver patent. That rejection was affirmed by the Patent Office's Board of Appeals on April 10, 1998.

*The ITC Proceedings*

While the instant case was stayed, a two week trial was held in November 1994 before ITC Administrative Law Judge Janet D. Saxon. Judge Saxon filed an initial determination on March 23, 1995 in favor of Beautone. She construed the term "ionic" as requiring a definite positive or negative charge. She further concluded that the doctrine of prosecution history estoppel applied and barred 3M's argument that the non-ionic suspension stabilizers could act as an equivalent to 3M's claimed ionic stabilizer. She stated that "to read a claim that requires the use of an ionic suspension stabilizer as covering the exact opposite, i.e., a non-ionic suspension stabilizer, under the doctrine of equivalents would make the patent claim meaningless." She also cited the fact that 3M had failed to disclose to the PTO during the prosecution of the Baker–Ketola patent its knowledge that certain non-ionic suspension stabilizers with tension values below the claimed level would also work.

She rejected Beautone's argument that the phrase, "at least about 15.0," should be construed as including stabilizers with measurements as low as 14.8, but no lower on the grounds that it gave too narrow a construction to the word "about" in the claim. She also rejected 3M's contention that the word "about" should include stabilizers with interfacial tension measurements much lower than 15.0 dynes per centimeter, again noting 3M's failure during the prosecution history to disclose to the PTO that the inventors had successfully tested stabilizers having an interfacial tension substantially below 15.0 dynes per centimeters. Rather, she interpreted the phrase as requiring that the interfacial tension of the stabilizer be no less than 13.0 dynes per centimeter on the grounds that a "reader would not risk going much lower than one or two degrees below 15.0 dynes" because the patent "warns the reader that if the interfacial tension falls below about 15.0 dynes per centimeter, agglomeration may occur." Her ultimate finding was that 3M had not proved that Beautone had infringed the asserted claims.

Upon remand ordered by the Commission for additional findings, the case was assigned to Administrative Law Judge Paul J. Luckern, who filed his remand ID on August 8, 1995. Judge Luckern considered the claims, the specification and the prosecution history. He rejected 3M's *in situ* argument that the essential stabilizer be ionic only "during use" and concluded that claim 1 required that the suspension stabilizer be ionic when it is "charged to the reaction vessel as in claim 7." He interpreted the phrase "of at least about 15.0" to mean that the interfacial tension could "only be as low as 14.8 dynes per centimeter" based primarily on the fact that the test identified in the patent for measuring the interfacial tension had an experimental error range of 0.2 dynes per centimeter.

The Commission adopted Judge Luckern's initial determination and, applying his claim construction, issued its decision on December 15, 1995. It affirmed Judge Saxon's determination that Beautone's products did not infringe the Baker–Ketola patent claims either literally or under the doctrine of equivalents. In arriving at this conclusion, the Commission also adopted certain findings of Judge Saxon which were not in conflict with Judge Luckern's claim interpretation. Those conclusions were as follows:

1. The accused adhesive is made using nonionic stabilizers instead of ionic stabilizers called for in the '152 patent.

2. The nonionic stabilizers utilized by respondents work in a different way than the ionic stabilizers claimed in the '152 patent, and are thus not equivalent to the ionic stabilizers.

3. 3M forfeited any right to use the doctrine of equivalents to capture nonionic suspension stabilizers because of its knowledge that some

nonionic suspension stabilizers would work and its failure to disclose this knowledge to the U.S.Patent and Trademark Office.

4. 3M lost its right to use the doctrine of equivalents to capture nonionic suspension stabilizers having an interfacial tension below about 15.0 dynes per centimeter because of claim amendments and attorney arguments made during the prosecution history of the '152 patent. The stabilizers utilized in making the accused adhesive have an interfacial tension of 11.0 dynes per centimeter, which is below the 13.0 lower limit of interfacial tension covered by the '152 patent claims.

3M appealed the Commission's decision to the Court of Appeals for the Federal Circuit. It contended that if its proffered claim construction were adopted, Beautone's products would be found to infringe literally. Moreover, it argued that even if a narrower construction were adopted, Beautone's products still infringed under the doctrine of equivalents.

The Court of Appeals affirmed the Commission's determination. *Minnesota Mining and Manufacturing Co. v. United States Int'l Trade Comm'n*, No. 96–1156, 1996 WL 341105 (Fed.Cir. June 17, 1996) (*"Beautone I"*). It "agree[d] with the Commission's interpretation that the stabilizer must be ionic when it is put into the vessel." *Id.* at *1. It rejected 3M's argument that Beautone's non-ionic stabilizers were an equivalent substitute. In so doing, it commented that "[t]o so hold would effectively read the ionic limitation out of the claim." *Id.* The court concluded further that even under 3M's proffered *in situ* interpretation, its infringement claim failed for "lack of proof." *Id.* In a footnote, the court also found that 3M had waived review of the Commission's construction of the interfacial tension element because it had failed to challenge Judge Luckern's interpretation before the ITC. *Id.* at *2 n. **. It then rejected 3M's

interfacial tension equivalents argument because 3M had "proffered no evidence regarding Beautone's actual *in situ* interfacial tension." *Id.* at *2. Following the decision by the Federal Circuit, the stay in the instant case was lifted. The defendants now move for summary judgment.

## II.

Beautone first argues that it is entitled to summary judgment under what it terms the "law of the patent" doctrine. Drawing on the principles underlying the "law of the case" doctrine, it contends that the "law of the patent" doctrine necessarily flows from the Federal Circuit's decision in *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed.Cir.1998) (en banc), which declared that claim construction is a question of law subject to *de novo* review on appeal. It follows, according to Beautone, that once a Federal Circuit panel has construed a patent, the meaning of the claims is established as a matter of law (unless overruled by an *en banc* decision of the Circuit or by the Supreme Court) and, as a result, a later Federal Circuit or a district court is bound by the earlier ruling. Beautone therefore asserts that the Federal Circuit's decision, which it alleges adopted the Commission's interpretation, fixed the meaning of the Baker–Ketola claims, and when that meaning is compared to its products, Beautone argues that no infringement will be found (as both the ITC and the Federal Circuit determined). Accordingly, it maintains that is entitled to summary judgment.

Beautone also argues that 3M is collaterally estopped from relitigating the issue of Beautone's alleged infringement of the Baker–Ketola patent. It points out that the Commission has already determined that the same defendants using the same products and processes did not infringe claims 1, 2, 4, and 5 of the Baker–Ketola patent and that this decision was affirmed by the Federal Circuit on appeal. Therefore, Beautone contends collateral estoppel applies because 3M has already had an

**80**

opportunity to fully and fairly litigate its allegations before the Commission and the Federal Circuit and has lost that prior litigation.

3M counters that the Commission's determination and the Federal Circuit's affirmance of that decision do not compel summary judgment. First, 3M posits that the Federal Circuit did not affirm or render any construction of the Baker–Ketola claims and therefore its decision cannot bind this Court under the "law of the patent" theory. Second, it disputes Beautone's reading of the Federal Circuit's decision in *Cybor*, asserting that *Cybor* has nothing whatsoever to do with issue preclusion. Third, relying on *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed.Cir.1996), it contends that determinations of the ITC, even after review by the Federal Circuit, have no preclusive effect under the doctrine of collateral estoppel in a district court action for patent infringement.

*"Law of the Patent"*

■ Notwithstanding its analytical appeal, Beautone's "law of the patent" theory is ultimately not convincing. The Federal Circuit's decision in *Cybor* resolved a split of authority regarding the standard of review applied to issues of claim construction that had emerged following the Supreme Court's decision in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (*"Markman II"*). Although *Markman II* had unanimously affirmed the Federal Circuit's decision holding that claim construction was a purely legal question subject to *de novo* review on appeal, *Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir.1995) (*in banc*) (*"Markman I"*), in subsequent cases, several Federal Circuit panels applied a clearly erroneous standard to findings considered factual in nature that were incident to the trial judge's construction of the patent claims. In reviewing both its *Markman I* decision and the Supreme Court's opinion in *Markman II*, *Cybor* rejected the view that deference be accorded to a trial judge's asserted subsidiary or underlying factual determinations relating to claim construction and reaffirmed that claim construction was reviewed *de novo* on appeal. *Cybor*, 138 F.3d at 1456.

*Cybor* therefore has little or nothing to with the preclusive effect of either Commission determinations or the Federal Circuit's review of those determinations. The opinion is devoid of any reference to issue preclusion. Nor does it mention the "law of the case" doctrine from which Beautone contends the "law of the patent" is derived.[9] Accordingly, *Cybor* provides no support for the proposition that the Federal Circuit established a new doctrine of patent law which bars this Court from construing the Baker–Ketola claims or rendering an interpretation that is inconsistent with the construction allegedly adopted by the Federal Circuit.

Moreover, there is some merit to 3M's contention that if the "law of the patent" theory did in fact flow from *Cybor*, it still would not apply to this case because the Federal Circuit in *Beautone I* merely affirmed the ITC's determination without actually construing the Baker–Ketola

---

**9.** It is also worth noting that the "law of the case" doctrine, which Beautone contends underlies its proffered "law of the patent" theory, is only a "discretionary rule of practice." *See United States v. United States Smelting Refining & Mining Co.*, 339 U.S. 186, 199, 70 S.Ct. 537, 94 L.Ed. 750 (1950); *see also Southern Railway Co. v. Clift*, 260 U.S. 316, 319, 43 S.Ct. 126, 67 L.Ed. 283 (1922) ("The prior ruling may have been followed as the law of the case but there is a difference between such adherence and *res judicata;* one

directs discretion, the other supersedes it and compels judgment."); *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) (The "law of the case" doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power."). Accordingly, even if this Court were to accept Beautone's "law of the patent" theory, it alone would not bind this Court and compel summary judgment.

claims.[10] A review of the Federal Circuit's decision upholding the Commission's finding of no infringement establishes that the panel construed only the limitation requiring polymerization to take place "in the presence of ... an ionic suspension stabilizer." It specifically agreed with "the Commission's interpretation that the stabilizer must be ionic when it is put into the vessel." *Beautone I*, 1996 WL 341105 at *1. In so deciding, it noted that to adopt the claim limitation proffered by 3M "would effectively read the ionic limitation out of the claim." *Id.*

However, it is arguable that the Federal Circuit did not construe the interfacial tension limitation. Rather than examine the interpretations of "at least about 15.0" proffered by the parties, the panel held that 3M had waived review of the Commission's construction because it had failed to appeal Judge Luckern's interpretation before the Commission. *Id.* at *2 n. ** (citing *Checkpoint Sys., Inc. v. United States Int'l Trade Comm'n*, 54 F.3d 756, 760 (Fed.Cir.1995)). It then applied the Luckern interpretation that had been adopted by the Commission that "at least about 15.0" meant that the interfacial tension of the stabilizer be no lower than 14.8 dynes per centimeter, and rejected 3M's argument that Beautone's products had an equivalent interfacial tension. *Id.* at *2.

It follows, furthermore, that Beautone's contention that the Federal Circuit necessarily construed the interfacial tension limitation in order to reach its decision affirming the Commission's finding of no infringement because claim construction issues are subject to *de novo* review on appeal is without merit. As discussed above, a review of the Federal Circuit's opinion reveals that it held that 3M had waived challenging the Commission's interpretation and, as a result, did not actually construe the interfacial tension limitation. Therefore, even if Beautone's "law

of the patent" theory was persuasive, summary judgment would not be appropriate in connection with the interfacial tension limitation.

## Collateral Estoppel

■ Collateral estoppel, or issue preclusion, applies "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Texas Instruments*, 90 F.3d at 1568 (citing Restatement (Second) of Judgment, § 27 (1982)). In general, unless Congress expressly or impliedly indicated it intended otherwise, determinations of administrative agencies are also entitled to preclusive effect in federal court if the agency was acting in an adjudicatory capacity. *Id.* (citing *United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) and *Astoria Fed. Sav. Loan Ass'n v. Solimino*, 501 U.S. 104, 110, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991)). Indeed, a number of federal courts have accorded judicial decisions of the ITC preclusive effect. *See e.g., Aunyx Corp. v. Canon U.S.A., Inc.* 978 F.2d 3 (1st Cir.1992), *cert. denied,* 507 U.S. 973, 113 S.Ct. 1416, 122 L.Ed.2d 786 (1993) (upholding district decision giving ITC antitrust decision res judicata effect); *Union Mfg. Co., Inc. v. Han Baek Trading Co., Ltd.,* 763 F.2d 42, 45–46 (2d Cir.1985) (holding that ITC trademark decisions pursuant to 19 U.S.C. § 1337 are entitled to res judicata effect); *Baltimore Luggage Co. v. Samsonite Corp.,* 977 F.2d 571, 1992 WL 296368 (4th Cir. Oct.16, 1992) (concluding district court properly applied doctrines of res judicata and collateral estoppel to an earlier ITC determination concerning antitrust and unfair competition claims); *In re Convertible Rowing Exerciser Patent Litig.,* 814 F.Supp. 1197 (D.Del.1993) (giving

---

**10.** Ultimately, however, whether or not the Federal Circuit "construed" the Baker–Ketola claims is irrelevant to the disposition of these

motions because, as discussed above, Beautone's "law of the patent" theory is unavailing.

preclusive effect to ITC *factual* findings in patent infringement case under 28 U.S.C. § 1338).

■ Notwithstanding this general rule, however, the Federal Circuit's decision in *Texas Instruments* made clear that "decisions of the ITC involving patent issues have no preclusive effect in other forums," 90 F.3d at 1569. In that case (as here), the plaintiff filed a patent infringement action in federal district court and a parallel action before the Commission. *Id.* at 1563. However, unlike the present case, the plaintiff prevailed before the Commission whose decision was affirmed by the Federal Circuit. *Id.* The defendant subsequently prevailed in the district court action. *Id.* On appeal of the district court verdict before the Federal Circuit, the plaintiff contended that the ITC's prior finding of infringement by the same defendants, using the same processes, and the Federal Circuit's subsequent affirmance of that determination should be given preclusive effect under the doctrine of collateral estoppel. *Id.*

■ The panel rejected the plaintiff's argument. As support, it cited its previous decisions in which it had examined the legislative history of the Trade Reform Act of 1974, amending the Tariff Act of 1930, and had concluded that "Congress did not intend decisions of the ITC on patent issues to have preclusive effect." *Id.* at 1569 (citations omitted). Moreover, the panel was not persuaded by "recent changes in ITC procedures" or that Congress had conferred exclusive jurisdiction to the Federal Circuit to review both district court and ITC decisions involving patent issues. *Id.* Accordingly, it declined to abrogate the rule that decisions of the ITC concerning patent validity or infringement do not have

collateral estoppel effect in district courts.[11] *Id.*

This decision remains good law and forecloses giving collateral estoppel effect either to the ITC finding of no infringement or to the Federal Circuit's decision affirming that determination in this case. First, the cases according preclusive effect to ITC decisions cited by Beautone are inapposite. *Aunyx, Baltimore Luggage,* and *Union Mfg.* did not concern ITC determinations involving patent infringement or validity issues. *Aunyx* dealt with antitrust claims decided by the ITC, 978 F.2d at 7, while *Baltimore Luggage* addressed the preclusive effect of ITC determinations concerning the affirmative defenses of antitrust and unfair competition, 1992 WL 296368 at *4. *Union Mfg.* concerned an ITC unfair trade practice and trademark decision and specifically distinguished those claims from ITC patent validity determinations. 763 F.2d at 45. In *Convertible Rowing,* the court accorded preclusive effect to the ITC's *factual* findings in a patent suit, but nevertheless expressly recognized that patent infringement and validity determinations of the ITC were not entitled to preclusive effect. *Convertible Rowing,* 814 F.Supp. at 1201–02. Moreover, all of these cases were decided before *Texas Instruments.* Thus any inference that these cases somehow laid the groundwork for according ITC patent determinations collateral estoppel effect was ruled out by the *Texas Instruments* decision.

Beautone also asserts that even if *Texas Instruments* were still good law, it forecloses only the *offensive* (but not the *defensive*) use of collateral estoppel in patent cases. The argument is unpersuasive. *Texas Instruments* makes no distinction between offensive or defensive uses of collateral estoppel. Rather, as discussed

11. The holding in *Texas Instruments* is limited to the application of the doctrine of collateral estoppel to an ITC's prior patent determinations and the Federal Circuit decision on appeal of that determination. *Texas Instruments,* 90 F.3d at 1568 n. 9. A previous Federal Circuit decision, *Bio–Technology General*

*Corp. v. Genentech, Inc.,* had held that neither the determinations of the ITC nor the subsequent affirmance on appeal by the Federal Circuit had res judicata, i.e., claim preclusion, effect in district courts. 80 F.3d 1553 (Fed.Cir.1996).

above, the panel's decision was primarily based on precedent relying on the legislative history of the Trade Reform Act. Furthermore, its discussion of the "defenses" available to accused infringers simply flows from its holding denying preclusive effect to ITC determinations and to Federal Circuit decisions in appeals from ITC decisions. As the panel explained:

> [O]nce we accept ... that ITC decisions are not binding on district courts in subsequent cases brought before them, it necessarily follows that accused infringers can raise whatever defenses they believe are justified, regardless whether they previously raised them and lost in the ITC.

*Texas Instruments*, 90 F.3d at 1569.

In addition, to the extent Beautone asserts that the *Cybor* decision supports its proffered narrow reading of *Texas Instruments* (i.e., that it applies only to offensive use of collateral estoppel by plaintiffs in ITC contexts), its argument lacks merit for the same reasons that (as discussed above) Beautone's "law of the patent" theory failed. *Cybor* does not even mention the *Texas Instruments* decision. Nor does it discuss the preclusive effect of either ITC determinations or the Federal Circuit's review of those determinations. Accordingly, although the facts in this case appear appropriate for the application of collateral estoppel,[12] *Texas Instruments* controls and this Court is not precluded from reaching the substantive allegations of patent infringement.

Nevertheless, however, while the Commission's determination and subsequent affirmance by the Federal Circuit do not have collateral estoppel effect, *Texas Instruments* also makes clear that this Court cannot simply ignore the Federal Circuit's decision affirming the ITC finding of no infringement in this case. As the panel stated, while "district court[s] can attribute whatever persuasive value to the prior ITC decision that [they] consider[ ] justified," they "are not free to ignore holdings of [the Federal Circuit] that bear on cases before them." *Id.* at 1569. Moreover, this Court must bear in mind that on appeal "[s]ubsequent panels of [the Federal Circuit] are similarly not free to ignore precedents set by prior panels of the court," but are "bound to follow [Federal Circuit] precedents" and must have "thoroughly justified grounds" to deviate from prior panel holdings. *Id.*

In sum, while neither of the bases offered by Beautone—the "law of the patent" or collateral estoppel—for according preclusive effect to the claim interpretation adopted by the ITC and allegedly affirmed by the Federal Circuit carries the day, this Court must construe the Baker–Ketola claims and analyze the question of infringement against the background of these earlier proceedings.

## III.

Beautone argues that it is also entitled to summary judgment on the issue of infringement. It contends that, as used in the asserted Baker–Ketola claims, the claim language—"in the presence of ... an ionic suspension stabilizer having an interfacial tension of at least about 15.0 dynes per centimeter"—requires that the suspension stabilizer both be "ionic" and have an interfacial tension value no lower than 14.8 dynes per centimeter *when it is charged to the reaction.* Therefore, according to Beautone, because its two stabilizers, polyvinyl alcohol and HPMC, are *non-ionic* and have interfacial tensions of 9.0 and 13.0, respectively (and a combined

---

12. 3M has actually litigated the legal issues of claim construction and the factual issue of literal or doctrine of equivalents infringement against Beautone before the Commission. The Commission rendered a decision in favor of Beautone and on appeal, the Federal Circuit affirmed the Commission's decision. The Commission's claim construction and its determination of no literal or doctrine of equivalents infringement were "essential" to its decision that no violation of 19 U.S.C. § 1337 had occurred, and to the Federal Circuit's holding of non-infringement and affirmance of the Commission's decision.

interfacial tension of 11.0), it does not infringe the Baker–Ketola claims either literally or under the doctrine of equivalents. Beautone also contends that, in any event, application of the doctrine of equivalents in this case is limited by the countervailing doctrine of prosecution history estoppel because 3M amended its proposed claim language to include the disputed claim limitations in order to overcome the PTO examiner's prior art objection.

3M counters that the claim construction suggested by Beautone is incorrect, and upon proper construction, a finding of infringement is inevitable. 3M's construction of the "ionic" limitation focuses on the transitional phrase—"in the presence of"—which it asserts only requires that the stabilizer be ionic *during polymerization.* It argues that when Beautone's non-ionic stabilizers are mixed into the vessel, they combine with excess emulsifier molecules and in effect by borrowing the emulsifier's electrical charge become ionic and therefore literally infringe the "ionic" limitation. Thus, according to 3M, Beautone's stabilizers literally infringe the "ionic" limitation because, even though they start out as non-ionic, they become ionic *in situ* (when they interact with the anionic emulsifier), and, consequently, as in the patent claims, the polymerization takes place "in the presence of . . . an ionic suspension stabilizer."

3M also alleges that Beautone's stabilizers infringe the "interfacial tension" limitation literally and under the doctrine of equivalents. According to 3M, because the interfacial tension value of Beautone's stabilizers is sufficiently high to serve the purpose of stabilizing the polymerization to avoid agglomeration, they literally infringe the claimed stabilizers. 3M also asserts that in any event Beautone's stabilizers have an "equivalent" interfacial tension to that claimed because the difference, as measured by 3M's expert, between the *in situ* interfacial tension of the two processes during polymerization (when the stabilizer is performing its intended function) is

insubstantial. In addition, 3M challenges Beautone's assertion that the doctrine of prosecution history estoppel restricts or limits the range of equivalents. According to 3M, the disputed claim language was not prompted by the examiner's prior art rejection but rather was added to overcome the incompleteness objections.

■ Determining whether a patent has been infringed involves two steps. First, the asserted claims are construed. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581–82 (Fed.Cir.1996). This step is a determination of law, subject to *de novo* review on appeal. *Cybor,* 138 F.3d at 1454. Second, the construed claims are compared to the allegedly infringing products or process. *Id.* (citing *Markman I,* 52 F.3d at 976). This step is a determination of fact. *Minnesota Mining & Mfg., Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1570 (Fed.Cir.1992).

■■ Infringement will be found if the accused product or process meets every element of a claim either literally or under the doctrine of equivalents. *Texas Instruments,* 90 F.3d at 1563 (citing *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991)). The doctrine of prosecution history estoppel, however, prevents a patent owner from using the doctrine of equivalents to recapture subject matter relinquished during a patent's prosecution. *Litton Systems, Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1458 (Fed.Cir.1998).

*Claim Construction*

The issue of infringement turns on the construction of two claim limitations: (1) "in the presence of . . . an ionic suspension stabilizer" (the "ionic" limitation); and (2) "having an interfacial tension of at least about 15.0 dynes per centimeter" (the "interfacial tension" limitation).

Beautone contends that, as used in the Baker–Ketola patent, these two claim limitations require that the suspension stabilizer be "ionic" and have an interfacial tension value no lower than 14.8 dynes per

centimeter *when it is added into the reaction vessel.* Beautone cites the patent itself as support for its asserted construction. It remarks that the ordinary and accustomed meaning of the term "ionic" (i.e., carries a charge, either positive or negative) is the opposite of "non-ionic" (i.e., neutral or carries no charge), and that neither the patent nor any of its specific claims suggest any other meaning for the term. Thus Beautone contends that the "ionic" limitation requires that the stabilizer be ionic and cannot be construed as covering *non-ionic* stabilizers.

Beautone further argues that the patent specification and the prosecution and reexamination histories reinforce its asserted construction because they establish that the Baker–Ketola claims conceive of the suspension stabilizer element as a separate, externally added ingredient. Therefore, according to Beautone, it follows that the Baker–Ketola claims cannot be interpreted to encompass *in situ* formation of the ionic character of the stabilizer, but instead require the suspension stabilizer to be "ionic" when introduced to the reaction.

Beautone derives its interpretation of the "interfacial tension" limitation (i.e., that the Baker–Ketola claims should be construed to specify suspension stabilizers with interfacial tensions *no lower than* 14.8 dynes per centimeter) from the level of precision in the ASTM test identified in the patent for measuring tension. As the test has an "experimental error" of ± 0.2 dynes per centimeter and the phrase "at least" specifies a lower limit, Beautone argues that "at least about 15.0" means no less than 14.8 dynes per centimeter. According to Beautone, additional support for this interpretation rests with the fact that both the claims and the specification recite

the interfacial tension values to the *tenth* of a dyne per centimeter.

3M replies that the scope of the Baker–Ketola claims are much broader than Beautone's construction. It argues that the plain language of the claims does not require the stabilizer to be ionic *before* it is mixed into the reaction vessel. Rather, it posits that the phrase—"in the presence of"—means that the "ionic" limitation will be satisfied if the stabilizer becomes ionic during polymerization, i.e., if the ionic character of the stabilizer is formed *in situ.* According to 3M, that the stabilizer performs its intended purpose and function during polymerization further advances its *in situ* construction.

3M similarly challenges Beautone's 14.8 lower limit interpretation of the "interfacial tension" limitation. Focusing on the word "about" and cases construing that term (as well as similar indefinite terms),[13] 3M contends that the limitation should be interpreted in light of the stabilizer's function and purpose. Therefore, according to 3M, the phrase "about 15.0" should be construed to cover stabilizers with interfacial tensions values close enough to 15.0 dynes per centimeter that they serve the purpose of stabilizing the polymerization process to avoid agglomeration. 3M maintains that Beautone's reliance on measurement errors and decimal points is misplaced as neither relates to the function and purpose served by the stabilizer of stabilizing the polymerization or preventing agglomeration.

Determining the meaning and scope of a disputed patent claim requires an examination of the claims and specification. *Vitronics Corp.,* 90 F.3d at 1582. Other sources of intrinsic evidence, including the prosecution history and other claims, also give context to the meaning of the claims

---

**13.** 3M cites the following cases for the proposition that the intended function and purpose of the claim element should provide the benchmark: *Eibel Process Co. v. Minnesota & Ontario Paper Co.,* 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); *Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855 (Fed.Cir. 1988); *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1056 (Fed.Cir.1988); *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.* 614 F.Supp. 1278, 1307–08 (S.D.N.Y.1985), *aff'd in relevant part,* 781 F.2d 198, 199 (Fed. Cir.1986); and *Conopco, Inc. v. May Dep't Stores Co.,* 46 F.3d 1556 (Fed.Cir.1994).

and should be consulted in construing the disputed claims. *Id.* Extrinsic evidence, such as expert testimony, may also be considered if the intrinsic evidence is inconclusive. *Id.* at 1583 (citations omitted).

### 1. *"in the presence of ... an ionic suspension stabilizer"*

■ In the present case, a review of the claim language, the patent specification, and the prosecution and re-examination histories establishes that the "ionic" limitation does not cover *in situ* formation of the ionic character of the stabilizer, but rather requires that the stabilizer be ionic when it is added to the reaction. As an initial matter, the language of the asserted claims specifically call for an "ionic" suspension stabilizer. The term "ionic" is the opposite of "non-ionic," and has a definite and distinct meaning to a person having ordinary skill in the relevant art. "Ionic" material carries an overall charge, either positive or negative, while "non-ionic" material is neutral and carries no charge. Thus it follows that the words of the claims themselves foreclose an interpretation of the "ionic" limitation which encompasses non-ionic stabilizers. Indeed, to construe the claims otherwise would render the term "ionic" superfluous.

This understanding of the Baker–Ketola claims—that it does not cover *in situ* formation of the stabilizer but requires the stabilizer to be *ionic* when introduced to the reaction—is reinforced by the specification. The Background of the Invention section specifically refers to the suspension stabilizer as an "essential ingredient," which suggests that the inventors viewed the stabilizer as a separate, discrete, ready-to-use, externally added component of the claimed invention, rather than an element created *in situ* during the polymerization process.

The particular embodiments contained in the specification further confirm that the Baker–Ketola claims require that the stabilizer be ionic *when it is introduced to the reaction.* The exemplary stabilizers disclosed in the specification are all ionic.[14] In addition, each of the representative reactions uses an ionic suspension stabilizer that is externally added during the process.[15]

3M's assertion that this interpretation—that the stabilizer be ionic when added to the reaction—impermissibly limits the scope of the asserted claims to the particular embodiments is without merit. There is no difference in scope between the claims and the exemplary stabilizers and representative reactions contained in the specification. As discussed above, the claim terms specifically call for the use of an *ionic* suspension stabilizer. Therefore, the fact that all of the stabilizers disclosed in the specification are ionic and that each of the representative reactions uses an externally added ionic stabilizer confirms that the Baker–Ketola claims demand that the stabilizer is an externally added ingredient and is ionic when mixed into the reaction vessel. *Cf. Specialty Composites v. Cabot Corp.*, 845 F.2d 981 (Fed.Cir.1988) (declining to limit the word "plasticizers" to *external* plasticizers even though only *external* plasticizers were exemplified in the specification where neither the claims nor the specification specified between "in-

---

14. These exemplary stabilizers also all have interfacial tensions above 15.0 dynes per centimeter.

15. 3M's reliance on Example 1 in the specification as demonstrating that the Baker–Ketola claims cover *in situ* formation of the ionic character of the stabilizer is misplaced for substantially the reasons set forth in Beautone's Reply Brief. Example 1 complies with the patent's disclosure of only ionic, external, ready-to-use stabilizers. It differs from the

other examples only in so far as the ionic character of the stabilizer is brought about by neutralizing the polyacrylic acid, a step that is specifically called for in the specification. Example 1 merely shows the requisite neutralization first, which yields the external, ready-to-use stabilizer, to which the remainder of the reaction ingredients are then added. Therefore, there is no *in situ* transformation of a non-ionic stabilizer to an ionic stabilizer in the Baker–Ketola patent.

ternal and external" plasticizers); *Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (concluding district court did not err in adopting broader construction even though the particular embodiments disclosed in the specification may have suggested a narrower interpretation); *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121–22 (Fed.Cir. 1985) (holding district court erroneously relied on specification in reading limitations from other claims into the disputed claims).

Nor does the prosecution history require a different interpretation. During the prosecution, 3M added the stabilizer limitation that was contained in claim 7 (a claim that is not currently in dispute) to claims 1 and 4. On the one hand, because claim 7 specified that the stabilizer was to be "charged" to the reaction vessel, it is arguable that this meaning necessarily followed when claims 1 and 4 were amended, even though as amended they did not expressly call for "charging" the stabilizer to the reaction vessel. On the other hand, it is also possible to argue that 3M specifically omitted the element requiring the stabilizer to be "charged" to the reaction when it amended claims 1 and 4 to conform with claim 7 and therefore infer that claims 1 and 4 encompass *in situ* formation of the ionic character of the stabilizer. Accordingly, the prosecution history does not provide useful guidance in determining the meaning and scope of the disputed Baker–Ketola claims.[16]

On the other hand, however, 3M's 1994 reexamination remarks do not advance Beautone's interpretation. Although 3M characterized the stabilizer as "externally added" and referred to a prior art stabilizer as formed "*in situ*," these statements were not made to distinguish the proposed Baker–Ketola claims from the prior art. Rather a closer look establishes that 3M used the phrase "externally added" to draw a distinction between stabilizers, such as Silver's comonomer, which polymerized with other monomers to form the microspheres, and Baker–Ketola's ionic suspension stabilizers, which were external to the polymerization and did not become part of the microspheres. Moreover, 3M's *in situ* remarks simply involved recognizing that the Renfrew patent covered *in situ* formation of the suspension stabilizer. 3M then went on to argue that it would not be obvious to substitute Renfrew's *in situ* suspension stabilizer for Silver's comonomer because Renfrew's stabilizer homopolymerizes while Silver's comonomer copolymerizes with the other comonomers to form the adhesive microspheres.

In sum, the claim terms and the specification demonstrate that the ionic limitation of the Baker–Ketola claims requires that the suspension stabilizer be *externally added* to the reaction vessel and be *ionic* when so added.

2. *"having an interfacial tension of at least about 15.0 dynes per centimeter"*

■ The claim terms and the specification also support Beautone's proffered reading of the interfacial tension limitation—that the phrase "at least about 15.0 dynes per centimeter" encompasses suspension stabilizers with interfacial tensions no lower than 14.8 dynes per centimeter.[17]

16. Application of the doctrine of claim differentiation also does not warrant a different construction. While the difference between claim 7, which specifically requires "charging" the ionic suspension stabilizer to the reaction vessel, and claims 1 and 4, which only specify that the polymerization take place "in the presence of" an ionic suspension stabilizer, may imply a difference in scope, the claims and the specification, as discussed above, only support a single construction of the "ionic" limitation; namely that the claims conceive of the ionic stabilizer as a separate and distinct ingredient that is to be "externally added to" the reaction vessel.

17. 3M's argument that the stabilizer's function and purpose should guide the interpretation of the "interfacial tension" limitation is not persuasive. To hold that Beautone's stabilizers infringe simply because they provide sufficient stabilization during polymerization

Starting with the claim terms themselves, the phrase "at least about" modifies the tension value of 15.0 dynes per centimeter identified in the disputed claims. The words "at least" establish a lower limit to the tension value (i.e., no less than 15.0 dynes per centimeter), while the term "about" suggests that there is some degree of flexibility in that lower limit, but does not resolve the extent of that flexibility.[18]

The specification is instructive in this regard. All of the exemplary stabilizers contained in Table I have interfacial tensions greater than 15.0 dynes per centimeter. Moreover, a review of the specification in conjunction with the claims teaches that a *tenth* of a dyne per centimeter is a significant degree of specificity. The tension value of each exemplary stabilizers is given to the tenth of a dyne. The numerical value of 15 point zero (15.0) recited in the claims also specifies the tension to a tenth of a dyne. Moreover, the standard procedure for measuring interfacial tension specified in the specification is accurate to within two tenths ($\pm$ 0.2) of a dyne per centimeter. Therefore, because the specification warns that if the interfacial tension "falls below about 15.0 dynes per centimeter, there is insufficient stabilization of the final polymerized droplets and agglomeration may occur," a reader of the patent would not risk using a stabilizer with a tension of more than two tenths of a dyne per centimeter lower than 15.0. Accordingly, it follows that "at least about 15.0" means no less than 14.8 dynes per centimeter. *See e.g. Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1455 (Fed.Cir. 1988) (affirming a district court construction of an "at least about" limitation in which the district court had used measurement errors to aid its construction).

to avoid agglomeration ignores the express language of the claim which specifies a numerical limitation with a lower limit and would enlarge the scope of the claims beyond the terms and specification.

18. It is noteworthy that during the ITC proceedings two ALJs construed the "interfacial

## Literal Infringement

 Beautone does not literally infringe the Baker–Ketola patent because its suspension stabilizers do not satisfy each limitation of the Baker–Ketola claims. Beautone's recipe calls for two *non-ionic* suspension stabilizers, polyvinyl alcohol and HPMC, rather than an *ionic* suspension stabilizer. Moreover, the interfacial tension of polyvinyl alcohol is 9.0, the interfacial tension of HPMC is 13.0 dynes per centimeter, and their combined interfacial tension is 11.0 dynes per centimeter, which in each case is below 14.8 dynes per centimeter. Furthermore, even assuming Beautone's non-ionic stabilizers become ionic *in situ* and function like an ionic suspension stabilizer in the polymerization process, the claim language and the specification teach that the patent requires the stabilizer to be "ionic" and have the requisite interfacial tension when charged to the reaction vessel. Accordingly, Beautone's *non-ionic* stabilizers, even if they become ionic *in situ* when mixed with an anionic emulsifier, do not literally infringe the Baker–Ketola claims.

## The Doctrine of Equivalents

Because Beautone's STICK ON notes do not literally infringe the Baker–Ketola patent, it is necessary to consider whether they infringe under the doctrine of equivalents. Beautone contends that its stabilizers are not equivalents to those claimed by the Baker–Ketola patent because even if its non-ionic stabilizers form an "ionic" stabilizer *in situ* through association with other ingredients, they still do not amount to the "equivalent" of an *ionic* stabilizer.

Beautone further argues that its stabilizers are not equivalents because the interfacial tension of polyvinyl alcohol and

tension" limitation. Judge Saxon interpreted the limitation to cover stabilizers with interfacial tensions as low as 13.0 dynes per centimeter. On remand, Judge Luckern concluded that the limitation included stabilizers with tensions as low as 14.8, but no lower.

HPMC are 9.0 and 13.0 dynes per centimeter, respectively, which is much less than 15.0 dynes per centimeter. Moreover, Beautone asserts that the association between its stabilizers and the emulsifier, which 3M argues transforms the character of Beautone's stabilizers from non-ionic to ionic, has the effect of further lowering interfacial tension, "carrying the resultant interfacial tension further from that claimed, and thus evidences the substantial dissimilarity between the illusory *in situ* molecule and the stabilizer claimed." Finally, Beautone asserts that because the inventors tested non-ionic stabilizers with interfacial tensions below 15.0 dynes per centimeter and failed to disclose these stabilizers to the public, 3M is prevented from arguing that these undisclosed stabilizers are equivalents.

3M replies that Beautone's stabilizers are the "equivalent" of "an ionic suspension stabilizer having an interfacial tension of at least about 15.0 dynes per centimeter." It argues that although Beautone's stabilizers have interfacial tension values lower than 15.0 dynes per centimeter, they nevertheless are equivalents because they function in the same way to resist agglomeration and because the difference between the full recipe *in situ* interfacial tension values is negligible.

3M's interfacial tension equivalents argument relies primarily on the experiments and measurements conducted by 3M's expert, Dr. F. Joseph Schork. Dr. Schork measured the interfacial tension of Beautone's stabilizer at the point when it becomes ionic (after combining with the emulsifier) at an average value of 2.9 dynes per centimeter. He then prepared the Beautone and Baker–Ketola recipes and measured their respective *in situ* interfacial tensions during polymerization at 0.9 and 1.5 dynes per centimeter. 3M thus argues that the 0.6 difference in the *in situ* interfacial tension values demonstrates that the difference between Beautone's stabilizers and that claimed by the Baker–Ketola patent is "insubstantial." It

further adds that accounting for the 0.2 experimental error range the comparison could be as close as 1.1 (0.9 plus 0.2) and 1.3 (1.5 minus 0.2), which is a difference of only 0.2.

A product that "performs substantially the same function in substantially the same way to obtain the same result" as the invention will be found to infringe under the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Equivalence exists when the differences between the claimed invention and the accused device or process are "insubstantial." *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). "Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040 (recognizing that if the doctrine of equivalents is applied too broadly it "conflicts with the definitional and public-notice functions of the statutory claiming requirement").

As an initial matter, 3M does not argue equivalency in connection with the "ionic" limitation. Indeed, to hold that Beautone's non-ionic stabilizers are equivalent to 3M's ionic stabilizer "effectively read[s] the ionic limitation out of the claim." *Beautone I*, 1996 WL 341105 at *1. Therefore, because as discussed above, Beautone's non-ionic stabilizers do not literally infringe the "ionic" limitation, summary judgement of non-infringement of this limitation is warranted in Beautone's favor.

The interfacial tension of Beautone's stabilizers is not the equivalent of "at least about 15.0 dynes per centimeter." Polyvinyl alcohol and HPMC have interfacial tensions of 9.0 and 13.0 dynes per centimeter, and a combined tension of 11.0, which in each case is significantly less than 15.0 dynes per centimeter. Moreover, when Beautone's stabilizers allegedly become

ionic *in situ* (after combining with the emulsifier), the interfacial tension value of the associated *in situ* ionic stabilizer (as measured by 3M's expert) is 2.9 dynes per centimeter. Therefore, when compared to the interfacial tensions of the exemplary stabilizers in the specification which range from 15.4 to 21.2, the difference between the interfacial tensions of Beautone's associated *in situ* stabilizer and the claimed stabilizers cannot be said to be "insubstantial."

Moreover, 3M's reliance on expert evidence regarding the full recipe *in situ* interfacial tension values is misplaced. It ignores the definition set forth in the specification, which prescribes that "interfacial tension" is the "value determined between the monomer phase and a 1.0 percent by weight aqueous solution of the stabilizer." Dr. Schork measured the interfacial tension of the combination of the stabilizer and emulsifier rather than the tension of the stabilizer alone. Therefore, his comparison of Beautone's and the Baker–Ketola full recipe interfacial tensions is inapposite.

Furthermore, even though Beautone's stabilizers provide sufficient stabilization thereby preventing agglomeration and may function similarly to stabilizers with interfacial tensions of "at least about 15.0 dynes per centimeter," to conclude that they are "equivalents" to the claimed stabilizer would "effectively eliminate the [lower limit numerical limitation] of the claim in its entirety." *See Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040 ("It is important to ensure that the application of the doctrine of equivalents, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.").

In addition, that the inventors had tested stabilizers with interfacial tensions of less than 15.0 dynes per centimeter and were aware that such stabilizers actually worked but failed to disclose those stabilizers in the patent militates against concluding that stabilizers with interfacial tensions of less than 15.0 dynes per centimeter are "equivalents." *See Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1424 (Fed.Cir.1997) ("Thus, for a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly."); *cf. Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311 (Fed.Cir. 1998) (holding that if the inventors knew of prior technology but failed to disclose it in the patent, that technology cannot be used for purposes of infringement by equivalents where no equivalence has been found under 35 U.S.C. § 112, ¶ 6).

Accordingly, as the differences between the interfacial tension values of Beautone's stabilizers and that claimed by the patent are not "insubstantial," Beautone does not infringe the "interfacial tension" limitation under the doctrine of equivalents.

*Prosecution History Estoppel*[19]

Beautone contends next that application of the doctrine of equivalents in this case is limited by the countervailing doctrine of prosecution history estoppel. It argues that the "interfacial tension" limitation was added to overcome the examiner's prior art rejections under 35 U.S.C. §§ 102 and 103, and induce allowance of the patent. Therefore, according to Beautone, 3M is precluded from recapturing the surrendered subject matter and arguing that stabilizers with interfacial tensions of less than 15.0 dynes per centimeter are "equivalents." 3M replies that the reason for the addition of the disputed limitations was not to overcome the prior art but to respond to the examiner's incompleteness objections under 35 U.S.C. § 112. According to 3M,

---

**19.** Whether or not the doctrine of prosecution history estoppel bars 3M's equivalents argument is immaterial for the purpose of deciding this motion because, as discussed above, Beautone's stabilizers do not infringe the claimed stabilizers under the doctrine of equivalents.

the amendment that enabled it to overcome the prior art was the amendment which altered the description of the microspheres by inserting the phrase, "a major portion of," to modify "at least one oleophilic, water-emulsifiable alkyl acrylate or methacrylate ester." As support, it notes that the examiner's prior art rejection included claim 7 even though that claim already specified that the stabilizer be ionic and have an interfacial tension of "at least about 15.0 dynes per centimeter."

■ The doctrine of prosecution history estoppel prevents a patentee from recovering by the doctrine of equivalents subject matter previously conceded by the patentee during prosecution of the patent application to be outside the scope of the claim language. *Litton,* 140 F.3d at 1455. The common practice of amending claims during prosecution, even when an amendment has been made to overcome the prior art, "does not necessarily surrender all subject matter beyond the literal scope of the amended claim limitation." *Id.* at 1455–56. However, when an applicant narrows a claim during the prosecution and the prosecution record discloses no reason for the amendment, "a trial court should presume that the applicant did so for a reason related to patentability." *Id.* at 1456; *see Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040 ("Mindful that claims do indeed serve both a definitional and a notice function, we think the better rule is to place the burden on the patent-holder to establish the reason for an amendment required during patent prosecution."). Consequently, where a patent owner cannot give a reason for the amendment other than patentability, "a court should presume that the purpose behind the … amendment is such that prosecution history estoppel would apply." *Litton,* 140 F.3d at 1456 (citing *Warner Jenkinson,* 520 U.S. at 41, 117 S.Ct. 1040).

Because the disputed claim limitations were added following the examiner's prior art rejection and once they were added the patent issued, the presumption arises that the reason 3M added those limitations was to overcome the prior art. 3M's attempt to rebut that presumption and its assertion that the reason for the amendment was unrelated to the prior art are ultimately unpersuasive. Indeed, 3M's remarks accompanying the November 20, 1978 amendments, establish that the 3M added the now disputed stabilizer limitations to overcome the prior art:

> Furthermore, the claims have been amended to indicate that the microspheres are prepared by aqueous suspension polymerization wherein an ionic suspension stabilizer having a defined interfacial tension is contained. . . .

> Since the Examiner based his continued rejection of the claims on the prior art because they did not contain the requisite limitations, which the Examiner suggested be contained, it is deemed that the present amendatory language precludes the prior art rejection.

Moreover, although the examiner had intertwined the incompleteness and prior art rejections, 3M made no effort to disentangle them or distinguish which of its amendments was responsive to the prior art objections and which amendment it believed overcame the incompleteness objections. Accordingly, 3M cannot rebut the presumption that prosecution history estoppel applies and limits the range of equivalents that 3M can assert against Beautone.

■ Furthermore, the prior art rejections were based on the Pohlemann and Morehouse patents, which the examiner explained both taught "aqueous polymerization of acrylic esters in the presence of an emulsifier and an ionic suspension stabilizer." 3M had initially sought to distinguish the prior art based on type of polymerization used and the makeup of the microspheres, but the examiner rejected those arguments. He opined that 3M's arguments "pertain[ed] to products and processes which [we]re narrower in scope than those set forth in the claims," and directly referred to his other objections—that the description of the microspheres

and the process conditions were incomplete. Thus when 3M amended its claims and added both the "ionic" and the "interfacial tension" limitations, it was directly responding to the examiner's prior art and incompleteness objections. Moreover, because the Pohlemann and Morehouse prior art already specified the use of an ionic stabilizer, by narrowing its claims to only those stabilizers with interfacial tensions of "at least about 15.0 dynes per centimeter," 3M foreclosed the examiner's prior art rejection. Accordingly, it follows that 3M is estopped from arguing that stabilizers with interfacial tensions of less than "at least about 15.0" are "equivalents."

### IV.

For the foregoing reasons, Beautone's motion for summary judgment is granted.

It is so ordered.